UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LOCAL 689, AMALGAMATED
TRANSIT UNION,

    Plaintiff,

    v.

WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,

    Defendant.

Civil Action No. 16-1482 (JEB)

**MEMORANDUM OPINION**

Defendant Washington Metropolitan Area Transit Authority fired Seyoum Haile after an investigation into a fatal accident revealed that he had misrepresented his maintenance work on Metrorail tunnel fans. His union – Plaintiff Local 689 – contested this termination and ultimately secured an arbitral award that mitigated his penalty to a six-month suspension without pay. The Authority, however, refused to let Haile return to work. Plaintiff thus brought this action to enforce the Award, and Defendant responded by seeking to vacate it. As the Award meets the low bar required for confirmation, the Court has little choice but to grant Local 689's Motion.

**I.    Background**

The facts required to evaluate these Cross-Motions are straightforward. The Court first describes Haile's employment and termination. The following three sections then respectively discuss the Award, a related arbitral award, and the present litigation.

    A. <u>Employment and Termination</u>

In 2002, WMATA hired Haile as a General Equipment Mechanic to work on the air-circulation fans that ventilate Metrorail tunnels and, in an emergency, prevent the accumulation

1

of smoke therein. See ECF No. 9 (Motion to Confirm) at 4; id., Exh. 1 (Borchini Award) at 2, 4. Because Haile often did this job without direct supervision, the Authority required that he keep a daily log of his activities. Id. at 11.

Seven years in, Haile's logbook caught him in a lie. Although he reported to WMATA that he had spent a particular day troubleshooting a fan leak, he had actually driven across town to his cousin's home, where a parking ticket on his WMATA-owned vehicle tipped the Authority off to his true location. Id. Haile then compounded his misdeed by making false statements during the subsequent investigation into this discrepancy. Id. As a result, WMATA suspended him for ten days. Id.

Over the next several years, these events appeared to have chastened him. In particular, Haile executed his "primary responsibility" to conduct "monthly tunnel fan preventative maintenance inspections (PMIs)" without apparent issue. Id. To complete these PMIs, he had to visually examine a fan, test its functioning, and document the completion of certain tasks on a checklist. Id. at 4. The key testing portion of the protocol required that he turn the fan on both locally – via a manual switch – and remotely – by calling an operator at the Rail Operations Control Center (ROCC). Id. at 5. The ROCC operator would then control the fan through specific tasks as Haile observed its functioning. Id.

The veneer on Haile's image of reform, though, began to peel away on January 12, 2015. That day, an electrical malfunction in a metro tunnel caused a train to fill with smoke, resulting in the death of one passenger and the hospitalization of several others. Id. at 1. During this emergency, a ventilation fan – on which Haile had supposedly performed PMIs – turned on remotely, ran without incident for several hours, but then burned out. Id. at 17.

Although this malfunction did not cause the passengers' injuries, a federal investigation into the tragedy uncovered evidence that Haile had again been misrepresenting his work. Id. at 1. Upon inspection, WMATA's central-computer archives revealed that the burned-out fan had not been operated locally or remotely on September 24, October 3, or November 6, 2014, even though Haile had filled out PMI checklists showing that he had completed the testing on those dates. Id. at 17. (On the last date, though, an audio recording did at least indicate that Haile and his junior associate, Michael Binding, had tried unsuccessfully to get a ROCC operator to run through the required protocol. Id.)

On January 20, 2015, the investigators notified the Authority of these findings. Id. at 1. WMATA, in response, launched its own inquiry, which included a records review and interviews with both Haile and Binding. Id. at 2. In the end, the Authority terminated Haile for submitting inaccurate maintenance logs and making untruthful statements during the investigative interviews (again), but Binding received only a 3-day suspension for his role. Id. at 2-3.

B. Grievance and Arbitration

Plaintiff – Haile's union – timely challenged his termination under the grievance provisions of its Collective Bargaining Agreement with WMATA. Id. at 3. The parties, accordingly, took their disagreement to a three-person arbitral panel that they tasked with deciding whether Haile "was discharged for sufficient cause and, if not, what shall be the remedy." Id. at 3.

On April 4, 2016, that panel returned its 2-1 verdict in an "Opinion and Award" that "sustained in part and denied in part" his penalty. Id. at 22. The arbitral chair explained that, while the Authority had "sufficient cause" to punish Haile, the price for his actions should be "mitigated to a 180-day suspension without pay." Id. at 17, 22. The chair, in justifying this

3

conclusion, first recognized that Haile's misconduct was only a small part of systemic maintenance issues at WMATA that its management had "condoned." Id. at 18-20 (describing acceptance by management of blank or incomplete checklists). He also discounted Haile's "dated" prior offense for leaving the job without permission as being remote and distinct from the current one. Id. at 18-19. Having done so, the arbitrator further resolved that any appropriate penalty now had to be "rehabilitative, rather than punitive," and a weaker penalty would likely be sufficient in this context to deter any future misconduct on Haile's part. Id. at 22. Finally, the chair looked to mitigating circumstances that he believed warranted greater leniency, such as Binding's lighter penalty and the difficulties that mechanics like Haile experienced in getting ROCC operators to run through the PMI protocol. Id. (The dissenting view is not presented in the record.)

In closing, the Opinion also noted that the panel "retain[ed] jurisdiction of th[e] case for 30 days, in the event of unresolved issues." Id. (emphasis added). According to the record in this case, however, those 30 days elapsed without either party's returning with any problem to the panel. In fact, it seems that neither the Union nor WMATA ever gave any indication to the arbitrators that unresolved issues remained as to the remedy prescribed by the Award.

### C. Back-Wages Award

Implementation of this remedy nevertheless required the resolution of certain ancillary issues. Most notably, because Haile's new penalty consisted of only six months without pay, and he had been out of work for much longer by this time, the Authority needed to pay him for that additional period. On May 16, several days after the panel's jurisdiction had lapsed, the Authority thus sent his Union a memorandum entitled "Implementation of Arbitration Award –

4

Seyoum Haile," which laid out its calculation of these back wages. See ECF No. 9-2 (Affidavit of Douglas Taylor with exhibits) at 4 (Memorandum from Union to WMATA).

The Union, however, disputed this sum. See id. at 7-8 (Letter on May 23, 2016, from Douglas Taylor to Donna Gaffney). In an effort to work out the issue, the two parties then exchanged a few rounds of emails over several weeks about how to account for certain side-work that Haile had done during his absence. Id. at 10-18 (Emails between Taylor and Gaffney from May to June 2016).

In these exchanges, the Authority never indicated that it planned to challenge the mitigation of Haile's punishment in the underlying Award. Id. Quite the contrary, in at least one email, the Union inquired as to why Haile had still not been put back on the work schedule, and WMATA seemed surprised to learn that this had not yet occurred. Id. at 15 (Emails between Gaffney and Taylor on June 6, 2016). That same Authority employee reported back to the Union three days later – on June 9, 2016 – that Haile had now been scheduled for his required reinstatement physical the next week. Id. at 16 (Email from Gaffney to Taylor).

Still unable to reach accord on the back-wages dispute, though, the parties took this matter to a different arbitral panel just one day later on June 10. Id. (Emails between Gaffney and Taylor from June 9-10, 2016). That panel issued a Stipulated Award the same day that granted Haile $20 per hour for a 40-hour workweek for the additional time that he was away from his job. See Mot., Exh. 4.

D.  Present Case

End of story? Not so fast. A month later, WMATA had still not put Haile back on the job. The Union thus filed this case on July 20, 2016, to confirm the first Award. See ECF No. 1 (Complaint). The Authority responded a month later with a counterclaim seeking to vacate it.

5

See ECF No. 5 (Answer and Counterclaim). After considering their subsequent Cross-Motions to these respective ends, see Mot.; ECF No. 10 (Cross-Motion to Vacate), the Court ordered WMATA to submit supplemental briefing on specific issues. See ECF No. 18. It having now complied, see ECF No. 19 (Supplemental Brief), this matter is ripe for decision.

**II.    Legal Standard**

Judicial review of arbitral awards is "extremely limited." Kurke v. Oscar Gruss & Son, Inc., 454 F.3d 350, 354 (D.C. Cir. 2006). "Courts . . . do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38 (1987). A court is thus not "authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract." Id. at 36; see Steelworkers v. Enter. Wheel & Car Corp., 363 U.S. 593, 599 (1960) (holding award should not be rejected simply because court's "interpretation of the contract is different from arbitrator's").

A federal court must instead confirm an award even if it "is convinced [the arbitrator] committed serious error." Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (quoting Eastern Associated Coal Corp. v. Mine Workers, 531 U.S. 57, 62 (2000)). An award, in other words, is legitimate so long as the "arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." Id. "It is only when the arbitrator strays from interpretation and application of the agreement and effectively dispense[s] his own brand of industrial justice that his decision may be unenforceable." Id. (quoting Enter. Wheel, 363 U.S. at 597) (quotation marks omitted).

6

**III. Analysis**

The common-law standard of deference to arbitral awards places a heavy thumb on the scale in favor of the Union here. The Authority has made its task to offset this weight harder still by waiting until its Answer to press a claim to vacate the Award, thereby raising the specter that its effort to do so is not merely without merit but also untimely.

In the end, WMATA likely fails to clear both hurdles. Because it more clearly falls short as to the merits of its claim, however, the Court first proceeds to discuss and reject the three substantive bases upon which it attacks the Award. The Court then briefly explains why it is also skeptical of the Authority's timeliness argument, but declines to decide the issue on this briefing.

A. Merits

None of the three grounds that the Authority presses to vacate the Award passes muster. The Court takes up first its contention that the arbitrator's decision manifestly disregarded the CBA and then turns to its alternative arguments that the Award was nevertheless arbitrary and capricious or in violation of public policy.

1. *Departure from CBA*

WMATA first claims that the Award "must be overturned because it manifestly disregarded the law by altering the unambiguous language in the CBA, and thus fails to draw its essence from" that agreement. See Cross-Mot. at 14. The Award, however, hews sufficiently close to the CBA to compel confirmation here – *i.e.*, the arbitrator was at least arguably construing or applying the contract. Major League Baseball, 532 U.S. at 509.

In support of its argument to the contrary, Defendant contends that the arbitrator failed "to acknowledge and apply [the Authority's] specific reservation of the right to discipline its

7

employees and to develop and enforce reasonable rules." Cross-Mot. at 14. It urges that this reservation right arises from Section 102(b) of the CBA, which provides:

> The Union acknowledges that all matters pertaining to the management of operations, including the type, kind and extent of service to be rendered to the public, . . . <u>standards for the promotion of employees and their discipline and discharge for proper cause</u>, and the development and enforcement of reasonable rules and regulations regarding employment are the prerogatives of the Authority and are reserved by the Authority unless expressly waived by specific provisions of this agreement, or by past practices of the parties.

<u>Quoted in</u> ECF No. 14 (Reply) at 2-3 (emphasis added); <u>see also</u> Cross-Mot. at 3 (with minor differences). By this reservation, the Authority asserts that it holds "clear and unfettered discretion to terminate an employee, such as [Haile], for egregious conduct." Cross-Mot. at 16.

The chief problem with WMATA's argument is that Section 104(d) of the CBA later provides that "[a]n employee will not be discharged, suspended or otherwise disciplined, nor will entries be made against the employee's service record <u>without sufficient cause</u>." Mot., Attachment 5 (CBA Provisions) at 2 (emphasis added). As the Union points out, this clause seemingly limits the Authority's discretion to discipline employees absent sufficient cause or, as Section 102 relates, without "proper" cause. <u>See</u> Reply at 3. The arbitrator's understanding was reasonable that this clause allowed him to consider whether the seriousness of any particular ground for discipline warranted the harsh penalty of termination or only something less. This limit on the Authority's discretion to fire an employee for cause, moreover, is implicitly conceded by the very question that WMATA agreed to pose to the arbitrator in this case – namely, "whether [Haile] was discharged for <u>sufficient cause</u> and, if not, what shall be the remedy." Award at 3 (emphasis added).

The Award wisely cites to these relevant CBA provisions and, accordingly, proceeds to analyze whether "sufficient cause" existed for a discharge on the relevant facts in Haile's case. Id. at 3-4, 17-22. It also provides several reasons, such as the Authority's tacit acceptance of Haile's actions, as grounds to support its conclusion that sufficient cause for a termination did not exist on these facts. Id. at 17-22. Nothing in the actions of the arbitral panel appears to contradict the plain terms of the CBA as a result.

Suffice it to say, then, that the arbitral panel's actions do not rise to the much higher showing required to demonstrate that it was effectively doling out its own brand of industrial justice. Major League Baseball, 532 U.S. at 509. As this Circuit has repeatedly admonished in the context of arbitrations under a CBA, "[T]he parties have necessarily bargained for the arbitrator's interpretation of the law and are bound by it." Am. Postal Workers Union v. USPS, 789 F.2d 1, 6 (D.C. Cir. 1986); accord USPS v. Am. Postal Workers Union, 553 F.3d 686, 695 (D.C. Cir. 2009) (same). As a result, where that arbitrator does not "render[ ] a judgment based on external legal sources, wholly without regard to the terms of the parties' contract," even his erroneous interpretation of the CBA must withstand review by this Court. Am. Postal Workers, 789 F.2d at 8. WMATA's argument, at the very most, might hope to demonstrate an erroneous interpretation, and it certainly does nothing more.

As such, this volley fails. If WMATA is correct that running a safe metro requires unfettered discretion to fire employees when they breach cardinal safety protocols, its remedy lies in negotiations over a new CBA with the Union for such authority. That, however, is not what it appears to have bargained for under the current one. As the following section demonstrates, moreover, WMATA's own policies do not compel a more draconian result than that reached by the arbitrators here.

9

### 2. *Arbitrary and Capricious*

The Authority next argues that the Award is nevertheless arbitrary and capricious because the grounds for it "cannot be inferred from the facts of the case." Cross-Mot. at 18 (quoting Lifecare Int'l, Inc. v. CD Med., Inc., 68 F.3d 429, 435 (11th Cir. 1995)). Although WMATA largely regurgitates its argument above on this score, it concludes on a final novel ground that there is no "rational basis" for the Award because the decision would "bring[] about an absurd and unreasonable result that is incompatible with common sense, thwarts the goals of collective bargaining, and seriously compromises the public interest by undermining WMATA's ability to operate a safe Metrorail system for residents and visitors of our nation's capital." Id. at 19.

Even assuming that this arbitrary-and-capricious standard could serve as a legitimate ground to vacate the Award, a questionable premise from the outset, the Authority's argument does not persuade. To the extent that its position rests again on the arbitrators' supposed failure to ground the Award in the CBA, it founders for the reasons explained above.

In going further to allege that the Award is "unreasonable and absurd" or compromises safety, the Authority overreaches. As the arbitration panel noted, WMATA itself established a couple of "cardinal" safety rules, which Haile's actions likely violated. See Award at 4. The question, however, is not whether Haile committed misconduct, but rather whether violation of these cardinal rules requires the termination of someone in his position. One, in fact, contains no mention of a penalty at all, and the other explains only that a violation could lead to consequences including termination or reassignment. See MSRPH Cardinal Rule 1.38 (providing for no particular punishment in event of making false statements in a report); MSRPH Cardinal Rule 1.1 (providing that in case of violation, "[d]isciplinary action will include permanent disqualification from safety sensitive positions or dismissal") (emphasis added). By

10

its own pen, the Authority has thus conceded that someone like Haile, who has violated these cardinal rules, might reasonably continue in his employment. Indeed, WMATA appears to have given Haile only a 10-day suspension without pay for his first such indiscretion. The arbitrator's six-month suspension without pay is plainly more severe than that previous penalty, if ultimately less draconian than the termination that the Authority prefers.

The Court, as a result, sees no grounds for it to conclude that the arbitrators' concurrence in the implicit concession embodied in these cardinal rules somehow amounted to absurdity. This is especially so given the arbitrators' careful efforts to articulate specific facts and reasoning to support the mitigation of Haile's punishment. As a reminder, that discussion pointed in part to the much lesser penalty received by Binding (a 3-day suspension) for similar acts and the Authority's own complicity in treating the PMI checklists as mere formalities. See Award at 19-21. The Court, therefore, concludes that the Award is not arbitrary and capricious or lacking in any reasonable foundation.

### 3. *Public-Policy Exception*

The Authority finally offers that the Award must nevertheless go unenforced because it violates a clear public policy providing for the safe management of the metro system. See Cross-Mot. at 8-14. WMATA points in particular to the compelling fact that Haile's actions in falsifying the maintenance records might have caused smoke-related death or serious injury to additional passengers. Id. at 13. While those involved in the tragedy were rescued before the fan he misrepresented working on burned out, and were not injured as a result of his misconduct, this was merely fortuitous. If the failure had occurred sooner, additional fatalities may have occured. The Court thus has no trouble concluding that WMATA is correct in saying that the termination of such an employee "clearly implicates public policy." Id. Indeed, the Court agrees that such a

11

penalty seems wholly consistent with the Authority's important efforts to improve the safety of the metrorail system and may even have been the more just outcome here.

This alone, however, does not give this Court the power to vacate the Award. In this Circuit, in particular, the public-policy exception is "extremely narrow." Am. Postal Workers, 789 F.2d at 8-9 (criticizing more expansive doctrine in First Circuit); see Exxon Shipping Co. v. Exxon Seamen's Union, 993 F.2d 357, 363 (3d Cir. 1993) (distinguishing between this Circuit's restrictive test and broader approach in First, Third, Sixth, Seventh, Eighth Circuits). "[T]he exception applies only when the public policy emanates from clear statutory or case law." Am. Postal Workers, 789 F.2d at 8. Even then, our cases instruct, the Court should only refuse to confirm "if the award itself violates established law or seeks to compel some unlawful action." Id.; see Exxon Shipping, 993 F.2d at 363 (describing D.C. Circuit as holding "such an award only violates public policy where it contravenes a rule of positive law which forbids reinstatement of the employee"); Gulf Coast Indus. Workers Union v. Exxon Co., U.S.A., 991 F.2d 244, 250 n.7 (5th Cir. 1993) (same).

For better or worse, this Court is obliged to give this restrictive test due weight. To be unenforceable, under this Circuit's test, the Award would either need to violate a positive legal proscription forbidding the reinstatement of Haile or otherwise compel illegal conduct. Am. Postal Workers, 789 F.2d at 8. The Authority makes no such showing. Relying instead on a broader approach to the exception applied in other Circuits, WMATA looks backward to actions that Haile took to compromise the Authority's compliance with its safety and maintenance obligations. See Mot. at 10-11, 13. But those actions say nothing about whether enforcement of the Award would continue to present such a problem. Placing Haile back to work certainly does not compel him to again shirk his duties, nor does it force the Authority to tacitly condone or

assist such behavior, as the arbitrator found that it had done in the past. WMATA likewise does not identify any law that forbids it from hiring people like Haile for critical safety positions. Rather, it points only to general laws requiring that it conduct maintenance on its equipment and keep accurate records of that work to receive its funding.

This recitation might ordinarily end the matter. The Court must go a step further here, however, and consider whether an intervening Supreme Court case adopts an analysis that is in some tension with this Circuit's restrictive public-policy test. In E. Associated Coal Corp. v. United Mine Workers of Am., 531 U.S. 57 (2000), the Supreme Court rejected an argument by an employer that the public-policy exception made an arbitral award unenforceable because that award ordered the reinstatement of a truck driver who twice tested positive for marijuana. In so doing, the Court nevertheless conceded that it agreed, "in principle," with the employer's argument that "courts' authority to invoke the public policy exception is not limited solely to instances where the arbitration award itself violates positive law." Id. at 63.

A concession of this sort might stand in some tension with this Circuit's past rendition of the public-policy exception, but nevertheless provides no aid to the Authority's cause here. Id. at 68 (Scalia, J., concurring in judgment) (discussing implications of majority's concession). In Eastern Associated, the Supreme Court went on to squarely reject the employer's argument that the district court had misunderstood the appropriate standard when it asked whether the award "violates" positive law, rather than whether it was merely "contrary to" public policy. Id. at 63 (stating clearly that "the district court correctly articulated the standard"). In fact, the opinion framed the correct inquiry in this context along a similar formula to that employed in this Circuit: "[T]he question to be answered is not whether [the employee's] drug use itself violates public policy, but whether the agreement to reinstate him does so[;] . . . [or rather] does a contractual

13

agreement to reinstate [the employee] . . . run contrary to an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests?" Id. at 62-63.

Framed in this manner, the Supreme Court then surveyed several laws that – in the words of the lower court – provided a "strong regulation-based public policy against drug use by workers who perform safety-sensitive functions." Id. at 61, 63-64. Despite these on-point regulations as to the employee's past misconduct, though, the Court nevertheless affirmed "that [the employee's] conditional reinstatement did not violate that policy." Id. at 61. In particular, the Court rejected the notion that a recidivist drug user would necessarily be prone to violate again the proscriptions against such use, especially given the harshness of the three-month suspension without pay that he received from the arbitrators. Id. at 66.

Little is different in Haile's case, except of course for the fact that the Authority points to no law that Haile's underlying conduct even violated. On the contrary, WMATA relies on regulations and laws that govern its conduct, arguing that Haile "compromised WMATA's ability to meet its safety obligations." Cross-Mot. at 10 (emphasis added). The Authority points, in particular, to laws that require it to develop a management plan and to keep accurate records. Id. at 11-12. But none of these laws seeks to regulate the Authority's ability to hire or retain employees to execute those obligations. As should be evident then, these laws also say nothing about the inquiry most critical to Haile's case – *i.e.*, whether putting him back on the job would run contrary to an explicit, well-defined, and dominant public policy against his employment.

This Court, therefore, is obliged to conclude that the public-policy exception provides no basis to vacate this Award. Plugged into the Supreme Court's formula, the contractual agreement to reinstate Haile does not run contrary to an explicit, well-defined, and dominant

14

public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests. This Court's hands are tied.

B. Timeliness

Although the preceding section provides a sufficient basis for the confirmation of the Award, the Court ordered supplemental briefing on an alternative holding, which bears some explanation. As previously mentioned, the Authority waited until August 19, 2016, to file its claim to vacate. See ECF No. 5. This was over 4 months after the arbitral panel issued the Award on April 4.

Such a delay in pressing its cause has serious potential repercussions for WMATA. When a party seeking to vacate an arbitral award fails to file a timely motion to do so, it is typically barred "from later raising any defenses to the confirmation of the award that could have been raised in the vacation motion." Sheet Metal Workers Int'l Ass'n v. Systemaire, Inc., 241 F.3d 972, 975 (8th Cir. 2001) (citation omitted); Glaser v. Legg, 928 F. Supp. 2d 236, 240 (D.D.C. 2013); see also 5 N. Peter Lareau, National Labor Relations Act: Law and Practice § 41.09[3][b] (2d Ed. 2014) ("[C]ourts recognize that the merits of an arbitration award may not be challenged after the limitations period has expired . . . ."). This rule operates as an essential corollary to the federal policy according finality to labor awards because it prevents losing parties from needlessly dragging out the proceedings. Turner v. United Steelworkers of Am., 581 F.3d 672, 676 (8th Cir. 2009).

As Local 689 asserts, this presents substantial trouble for the Authority in this action. The 90-day period found in the District of Columbia Arbitration Act, D.C. Code § 16-4423(c), is appropriately borrowed for a motion to vacate an arbitral award governed by the federal common law. See County of Oneida v. Oneida Indian Nation of New York State, 470 U.S. 226, 240-41

(1985) (laying out test); see also Eichleay Corp. v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 944 F.2d 1047, 1061-62 (3d Cir. 1991) (collecting cases from First, Second, Third, and Sixth Circuits holding similar period appropriately borrowed for federal labor-arbitration claim). This limitations period, moreover, advances the clear objective laid out in the WMATA Compact to make "final and binding" awards that arise from its CBA-related arbitrations. See D.C. Code § 9-1107.01-66(c) (2010); see also Office & Prof'l Empl. Int'l Union v. WMATA, 724 F.2d 133, 138 (D.C. Cir. 1983) ("The Compact provides that arbitration shall be "final and binding."). In its supplemental briefing, the Authority thus wisely all but concedes that this is the correct limitations period to govern its efforts to vacate this Award. See Supp. Br. at 2-3.

WMATA, however, continues to advance two additional arguments to try to avoid this bar, which it then briefs in only a cursory manner. Specifically, the Authority contends that the ancient common-law doctrine of *nullum tempus* prevents the application of this limitations period to it, see Cross-Mot. at 20-22 (claiming that "because WMATA is a state-level government entity, its claims are not subject to a limitations defense because of the need to protect the public interest"), or, alternatively, that it complied with the 90-day limitations period because the Award was not final and appealable until the second arbitral panel handed down the later back-wages award. Id.

The Court is skeptical that the Authority could prevail on either argument, but declines to go so far as to directly hold as much given the complexity of the issues involved, the lack of assistance from the parties, and the fact that the holding above on the merits suffices to completely dispose of this case.

A few points help to flesh out the Court's reluctance on this score. As to the first argument, none of the cases cited by WMATA supports the type of sweeping common-law immunity that it wishes to claim here and others explain that such immunity is actually limited. See, e.g., Solid Rock Church, Disciples of Christ v. Friendship Pub. Charter Sch., Inc., 925 A.2d 554, 559-60 (D.C. 2007) ("[The District] . . . enjoys limited sovereign immunity from the operation of statutes of limitation under the common law.") (emphasis added); see also Metropolitan R. Co. v. District of Columbia, 132 U.S. 1 (1889) (denying *nullum tempus* immunity for tardy claim brought by congressionally chartered transit company). In fact, WMATA concedes in its supplemental brief that it has provided the Court with no case that maps on to the situation presented by this one. See Supp. Br. at 4. Several critical questions are also never addressed in the briefing, including whether the Compact's finality provision or the District of Columbia, Virginia, and Maryland uniform arbitration acts might waive any possible immunity to this particular limitations bar.

As to the Authority's second argument – *i.e.*, that it actually complied with the time limit here because that time should run from the second award – the parties never addressed the application of the correct legal rule for this case. As a refresher, there is no question that the Union's Motion to Confirm was timely or that the Authority's counter-claim exceeded the applicable 90-day limitations period if that period ran from the date on which the Award was issued. See ECF No. 5. The panel also clearly thought that it had completed all the tasks put before it by the parties as to both liability and remedy at the time of its Opinion on April 4, 2016. See Award at 22 (retaining jurisdiction for 30 days in the event additional problems arose). The arbitrators did so with good reason. Their Award provided direct answers to the questions both of

17

whether Haile was terminated with sufficient cause (no) and, if not, what would be the remedy (reinstatement after a six-month suspension without pay). Id.

The Authority, however, mistakenly seeks to rely exclusively on 28 U.S.C. § 1291 – a rule governing appeals from final judgments in federal district courts – to argue that it was not tardy in seeking to vacate the Award because the limitations period should run from the issuance of the second back-wages award. See Cross-Mot. at 19-20. But it is the final- or complete-arbitration rule that governs whether an arbitral award is final, not the final-judgment rule. See Peabody Holding Co. v. United Mine Workers of Am., 815 F.3d 154, 159-60 (4th Cir. 2016) (noting difference). In addition, even after the Court flagged this issue for supplemental briefing, the Authority chose to largely rest its argument on the unsustainable position that the Award did not address a remedy, despite the fact that the Opinion clearly provided for reinstatement after the suspension. See Supp. Br. at 7-9 ("In the instant case, the arbitration proceeding was not completed with the issuance of the April 4, 2016 Borchini decision, which addressed liability only.").

Neither party, as a result, ever wrestled with the relevant question to decide this case: How does the final-arbitration rule apply where the arbitrators mistakenly think they have resolved all the remedial issues and the parties never act to disabuse them of that misconception? The answer to that question also happens to be unclear in this Circuit. This Court would be ill served to wade into that thicket without any functional beacon from the parties to guide its way.

As a result, the Court is most comfortable with a course of avoidance, as this timeliness ground is at most an alternative means to the same end of affirming the Award. It thus leaves the question for another day.

## IV. Conclusion

For the reasons above, the Court must grant Plaintiff Local 689's Motion to Confirm and deny the Authority's Motion to Vacate. A contemporaneous Order will so issue.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: April 19, 2017